IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Elizabeth Slice, ) | C.A. No. 3:09-00571-CMC |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **OPINION AND ORDER** |
| ) | **ON MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| Liberty Mutual Fire Insurance Company,[1] ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Through this action, Plaintiff, Elizabeth Slice ("Slice"), seeks reformation of an automobile insurance policy issued by Defendant, Liberty Mutual Insurance Company ("Liberty Mutual") to include $100,000 in underinsured motorist coverage. Slice maintains that she is entitled to reformation because elimination of her underinsured motorist coverage which was effected with her 1993 renewal and continued through at least February 2006, was not the result of a meaningful offer of underinsured motorist coverage as required by South Carolina law.

The matter is before the court on Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted in full.

---

[1] The complaint names two Defendants: Liberty Mutual Insurance Company and Liberty Mutual Insurance Group/Boston. In their Local Rule 26.01 responses, Defendants note that the first of these Defendants is misnamed and the latter is not a proper Defendant. Prior to the filing of the present motion, however, neither party took action to effect a change in the party designations. Nonetheless, in its motion for summary judgment, the now singular Defendant advises the court that "[t]he parties have agreed that [Liberty Mutual Fire Insurance Company] may be substituted for the currently listed Defendants." Dkt. No. 28, n.1. Having heard no objection from Plaintiff, the court directs that the caption be modified to include only a single Defendant: Liberty Mutual Fire Insurance Company. The claims against Defendant, Liberty Mutual Insurance Group/Boston, are dismissed without prejudice.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

**DISCUSSION**

From early in the 1980s through at least mid-2006, Slice and members of her immediate family were covered under automobile insurance policies issued by Liberty Mutual. It is undisputed

that prior to her renewal in 1993, Slice maintained $100,000 each in liability, underinsured and uninsured coverages. It is also undisputed that Slice returned at least two pages of a form to Liberty Mutual in May 1993 which, on their face, decline uninsured motorist coverage beyond that mandated by law and also decline any underinsured coverage (none being mandated by law). *See* Dkt. No. 28-1 at 2-3 (microfiched copies of form); Dkt. No. 28-3 at 13 (Slice Dep. at 28) (conceding signatures and marks on form are hers). Thereafter, through the date of her son's death in February 2006, Slice's automobile insurance policies consistently provided only the mandatory minimum uninsured motorist coverage and no underinsured motorist coverage.

Despite returning the signed form and annually reviewing declaration pages which reflected these selections,[2] Slice maintains that she misunderstood the intent of the form she signed in 1993, and continued to believe that her policies included $100,000 each in liability, uninsured and underinsured coverages. *See* Dkt. No. 28-3 at 16 (Slice Dep. at 35) (stating that her intent in signing the form was to continue the coverages she had). She, therefore, seeks reformation to include $100,000 in underinsured coverage applicable at least to the policy in effect in February 2006.[3]

Slice argues that reformation is appropriate, or at least that summary judgment is not, because "Defendant cannot produce proof that it mailed or Plaintiff received what Defendant denotes as pages one and two . . . of its four page form." Slice does not, however, claim that there

---

[2] In her deposition, Slice conceded that she received new declaration pages every year and that she reviewed them. Dkt. No. 28-3 at 18 (Slice Dep. at 37).

[3] Slice's son was killed in an automobile accident in February 2006. The other driver carried only nominal insurance. This dispute arose after Slice sought and was denied payment of underinsured motorist benefits from Liberty Mutual. In denying Slice's claim, Liberty Mutual noted that Slice had declined such coverage through a form she signed on May 11, 1993.

3

is any deficiency in the form presuming the complete form was mailed to her. *See* Dkt. No. 28-3 at 11 (Slice Dep. at 25).

For the reasons set forth below, the court concludes that Liberty Mutual is entitled to summary judgment on two grounds. First, the undisputed record demonstrates that Liberty Mutual sent and Slice received the full four-page form which she concedes provided proper notice of her options. Second, even if Slice actually received only the last two pages of the form, the content of those pages constitutes a meaningful offer.

In reaching these conclusions, the court applies the four-part standard adopted in *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 354 S.E.2d 555, 556 (S.C. 1987). Under this standard, an offer of optional coverage is adequate if: (1) the notification process is commercially reasonable; (2) the insurer specifies the limits of optional coverage rather than merely offering additional coverage in general terms; (3) the insurer intelligibly advises the insured of the nature of the optional coverage; and (4) the insured is told that optional coverages are available for an additional premium. *Id*. ("[S]tatute mandates the insured . . . be provided with adequate information, and in such a manner, as to allow the insured to make an intelligent decision of whether to accept or reject the coverage."). The insurer bears the burden of establishing that it made a meaningful offer. *Progressive Cas. Ins. Co. v. Leachman*, 608 S.E.2d 569, 571 (S.C. 2005).[4]

In reviewing the adequacy of the written form, the court applies a purely objective test and

---

[4] In response to *Wannamaker*, the legislature adopted statutory requirements for *initial* offers of optional coverages. S.C. Code Ann. § 38-77-350 (first adopted in 1989 and expressly applicable only to "new applicants"). When the statutory requirements are satisfied, the insurer enjoys a *conclusive* presumption that it made a meaningful offer. S.C. Code Ann. § 38-77-350 (B); *see also Leachman*, 608 S.E.2d at 572. For present purposes, the court presumes that this statute is not directly applicable because the offer at issue related to a renewed rather than a new policy.

4

disregards "the insureds [sic] knowledge or level of sophistication." *Croft v. Old Republic Ins. Co.*, 618 S.E.2d 909, 918 (S.C. 2005) (noting that, where the form satisfies the statutory requirements, the insurer receives "a presumption that it made a meaningful offer"):

> However, evidence of the insureds [sic] knowledge or level of sophistication is relevant and admissible when analyzing, under *Wannamaker*, whether an insurer intelligibly advised the insured of the nature of the optional UM or UIM coverage. It is a subjective inquiry to the extent the insured may offer evidence of his understanding, or lack thereof, of the nature of UM or UIM coverage. It also is an objective inquiry because the factfinder should consider the insureds [sic] knowledge and level of sophistication in determining whether the insurer intelligibly explained such coverage to the insured. . . . Whether the analysis is focused primarily on the written form, the *Wannamaker* analysis, or both, the purpose of requiring automobile insurers to make a meaningful offer of additional UM or UIM coverage is for insureds to know their options and to make an informed decision as to which amount of coverage will best suit their needs.

*Id*. at 918-19 (internal quotation marks omitted).

In the present case, the challenge to the adequacy of the offer rests solely on the premise that Slice did not receive the entire form which, she maintains, caused her to misunderstand the effect of her choices. Specifically, she maintains that she only received the last two pages and, as a result, incorrectly believed that she was declining additional coverage beyond that contained in her then-current policy, rather than declining *any* optional coverage, thus making a significant change from her longstanding practice of maintaining equal levels of liability, uninsured and underinsured coverages.

With respect to the allegedly missing pages, Slice relies on the South Carolina Court of Appeals decision in *Dewart v. State Farm Mut. Auto. Ins. Co.*, 370 S.E.2d 915, 918 (S.C. Ct. App. 1988). There the court held that an insurer failed to provide a meaningful offer when critical information was placed on a *separate* "stuffer" in the same envelope with the renewal notice but the stuffer was not mentioned in the renewal notice itself. As Judge Bell explained:

5

> Many recipients of these "stuffers" undoubtedly ignore and discard them as a matter of routine. In order for State Farm's insert not to be ignored as such "junk mail," it was incumbent upon the company . . . to include something on the renewal notice alerting the insured to read the insert. Placing critical information in two documents, without directing the insured to read both, was not a method reasonably calculated to draw the insured's attention to the nature of the offer. On the contrary, by splitting the information into separate documents without alerting the insured, State Farm conveyed the offer in a manner likely to keep the insured from finding an important explanation needed to understand it and to make an informed decision.

*Id.*, 370 S.E.2d at 917-18.

## I. Delivery of the full four-page form

Slice conceded that she received, completed and returned the two pages of the four-page form which are contained in the record. Dkt. No. 28-3 at 13-14 (Slice Dep. at 28-29). Although she testified that she had an independent recollection of receiving the form, she could not recall whether or not she received all four pages. *Id.* at 14-15 (Slice Dep. at 29-30) (conceding that she could not recall one way or the other). Thus, the evidence as presented by Slice demonstrates that she received at least part of the form, and contains no evidence that she did not receive the entire form. Notably, she conceded in her deposition that she perceived no deficiency in the offer if the entire form was considered. *Id.* at 11 (Slice Dep. at 25) (conceding she has no issues with the form itself).

Representatives of Liberty Mutual, on the other hand, testified that the normal practice was to send customers all four pages of the form but to retain microfiched copies only of the last two pages, the latter being the only pages reflecting customer choices and signatures.[5] *See* Fed. R. Evid. 406 (allowing reliance on evidence of routine practice of an organization); Dkt. No. 28-4 at

---

[5] To accept Slice's position would require the insurer to perform an act which is not commercially reasonable: retention of the full form as sent to the customer, rather than just the portion reflecting the customer's choices. This would double the need for copying and storage without providing substantially greater proof of what the customer received given that a customer might, despite receiving the full form, return only the signed pages.

6

9-11, 12-14, 18 (Meitler Dep. at 21-23, 29-31, 40). Liberty Mutual's representatives indicated that they had no reason to believe Slice had not received the first two pages (instructions and information) and every reason to believe that a customer would call if he or she received only the last two pages of a form which clearly consisted of more pages. Dkt. No. 28-4 at 13-14, 18 (Meitler Dep. at 30-31, 40). The latter presumption is particularly reasonable given that the last two pages are numbered "3 of 4" and "4 of 4" and that the third page of the form begins with an inquiry designated with the Roman numeral "II" and no other heading.[6]

Absent affirmative evidence that Slice did not receive the first two pages of the form, the testimony of Liberty Mutual's representatives, together with the format of the pages which Slice concedes she received and returned, constitutes undisputed evidence that Slice, in fact, received the complete form. Any conclusion to the contrary would rest on pure speculation.[7]

As noted above, Slice conceded in her deposition that she had no problems with the adequacy of the content of the complete form. She does not, in any event, argue that the complete form failed to constitute a meaningful offer. The undisputed evidence that Liberty Mutual sent the

---

[6] The court concludes that separate pages of a multi-page form should not be considered "separate documents" under *Dewart*. Even if they were so considered, the page numbering ("3 of 4" etc.) and use of Roman numerals to designate new sections (page three beginning with "II.") would be sufficient to alert the recipient to the existence of the other pages.

[7] In arguing that Liberty Mutual should have done something more, Slice relies on testimony from a sales agent that Liberty Mutual had a practice of calling customers when they reduced coverage to ensure the customer understood what they were doing. Dkt. No. 30-4 at 5-6, 7-8 (Horonzy Dep. 18-19, 24-25). To the extent this testimony relates to how Liberty Mutual handled customer responses to written offers such as in the form which Slice signed and returned, the witness could only testify as to his understanding of actions which may have been taken by another department (the underwriting department). Even if normally applied to customer responses to written offers, such a practice would not, by virtue of having been voluntarily provided, assume the import of a mandatory legal requirement. Evidence that Liberty Mutual may sometimes have gone beyond what the law requires does not, therefore, support imposition of a higher legal standard.

entire form, therefore, requires judgment in Liberty Mutual's favor that it made a meaningful offer and, consequently, that Slice is not entitled to reformation.

**II.     Adequacy considering only pages three and four.**

Even if the evidence were sufficient to present a genuine issue of material fact as to whether Slice received the complete form, Liberty Mutual would be entitled to judgment based on the content of the two pages which Slice concedes she signed and returned. The first of these two pages begins with the following heading: "II. OFFER OF *ADDITIONAL* UNINSURED MOTORIST COVERAGE." Dkt. No. 28-1 at 2 (emphasis added). Slice checked "no," indicating she did not "wish to purchase additional uninsured motorist coverage." As required for a negative response, she signed the following line confirming this decision. Given her negative response, she did not check any of the boxes for the amount of additional coverage desired. Notably, the list of available options is preceded by the following instruction: "If your answer is 'yes,' then specify the limits which you desire. These limits cannot exceed your automobile insurance liability limits." Given that Slice claims she intended to retain identical liability and uninsured motorist limit, she cannot have read the form to offer MORE uninsured coverage than she then held.

The next inquiry on the same page is the one critical to this action. This inquiry is headed "III. OFFER OF UNDERINSURED MOTORIST COVERAGE." Unlike the first inquiry, this inquiry does not refer to "additional" coverage. Thus, even if inclusion of the word "additional" in the uninsured motorist inquiry was confusing to a layperson, this inquiry does not raise the same concern.[8]

---

[8] The differences in form of the question relate to the existence of a state-law mandate that motorists carry a minimum amount of uninsured motorist coverage and the absence of any such requirement for underinsured coverage. Thus, any "election" with regard to uninsured motorist

As in response to the uninsured coverage inquiry, Slice checked "no" and signed to confirm her choice to decline coverage. Given this response, she did not check any of the boxes for the amount of additional coverage desired which, notably, included the specific amount she asserts she intended to retain. As with the uninsured coverage inquiry, the list of choices is preceded by the following instruction: "If your answer is 'yes,' then specify the limits which you desire. These limits cannot exceed your automobile liability limits." For the reasons explained above in regard to uninsured motorist coverage, this instruction precludes any reasonable interpretation of the form to be a solicitation for more coverage given that Slice then held (and asserts she intended to keep): equal liability and underinsured coverages.

The obvious import of these inquiries is not overcome by Slice's testimony as to her subjective understanding or assumption that the form was a solicitation for additional coverage beyond her then-current coverages. Slice has not identified anything in the form itself which would have led to such an understanding if read with reasonable care in the context of even the last two pages of the form.[9] Indeed, when asked in her deposition, Slice conceded that she found nothing in the question relating to underinsured coverage which was not understandable. Dkt. No. 28-3 at 17

---

coverage would be an election of "additional" coverage beyond the mandatory minimum.

[9] Slice suggests that the arrival of the form roughly seventy days before her renewal date and the stamped indication of her current coverages on the last page of the form led her to conclude this was a solicitation for even greater coverages. Neither factor, however, supports Slice's conclusions. First, the timing of arrival is equally consistent with asking whether the customer desires to renew at the same or some different level. Thus, the timing of arrival is an entirely neutral factor. So too is the stamp which serves as nothing more than a reminder of current coverages. Like the timing, it does not suggest either that the form is a solicitation for greater coverage or that it is not. What is more critical, is the actual content of the form which, even limited to the pages Slice concedes she received, completed and returned, clearly advised Slice that she could not obtain more uninsured or underinsured coverage than her liability coverage. Given that Slice already had the same amount of each coverage, this form could not have offered her any more uninsured or underinsured coverage than she then held.

9

(Slice Dep. at 36).

Likewise, the court finds no merit in Slice's arguments that she was "under the reasonable belief that she had maintained her existing [$100,000] in underinsured motorist coverage" and "that Defendant also believed she had" done so because no sales agent called her to see if she intended to reduce her coverage. As with the argument addressed in the preceding paragraph, these arguments focus on Slice's subjective understanding or intent. To the extent *Wannamaker* and subsequent cases may allow consideration of subjective understanding and intent, this argument is, nonetheless, unavailing given that the misunderstanding was not, in any way, attributable to Liberty Mutual. Even assuming Slice received only the third and fourth pages of the form, her construction of the form is not reasonable. Her claimed interpretation is, moreover, inconsistent with her failure to seek a correction during the subsequent thirteen-year period during which she concedes she received and reviewed the declaration pages which arrived with her annual renewals.[10]

Further, that employees or agents of Liberty Mutual may at some times and in some circumstances have called customers to insure that they understood and intended their decisions to reduce coverage and did not do so with regard to the form Slice returned in 1993 does not support reformation of the contract. There is, in the first instance, no suggestion that Slice knew of and

---

[10] The court presumes that, under normal circumstances, an insurer cannot cure its failure to make a meaningful offer by reliance on information contained in subsequent declaration pages. Indeed, in the typical uninsured or underinsured motorist coverage reformation case, subsequent declaration pages would not provide notice of an error because the failure of a meaningful offer left the insured without adequate notice of the available options.

The present situation is markedly different as Slice clearly understood that the option she now seeks was available and, indeed, had that coverage for many years. Her difficulty is not that she did not know what was available, but that she inadvertently declined the options she desired. Under these circumstances, and at least if her subjective intent is to be considered in regard to the adequacy of notice, it is only reasonable to also consider that her claimed intent is inconsistent with her failure to seek correction of the error over a period of many years especially as she concedes receiving and reviewing the annual declaration pages.

10

relied on this practice, much less that it was ever (much less routinely) applied to return of a form such as that at issue in this action.[11] Certainly, Plaintiff offers no authority for the premise that the law requires an insurer to confirm reductions of coverage in this manner based on the fact that it may sometimes have done so. Such a rule would, in any event, be contrary to public policy as it would discourage insurers from doing any more than the minimum required by law for fear of assuming an added legal burden.

## CONCLUSION

For the reasons set forth above, the court finds as a matter of law that Defendant[12] made a meaningful offer of underinsured coverage to Plaintiff in 1993 and that Plaintiff is not entitled to reformation of her insurance policy. The court, therefore, grants Defendant's motion for summary judgment in full and directs the Clerk of Court to enter judgment in Defendant's favor.

IT IS SO ORDERED.

                                                s/ Cameron McGowan Currie
                                                CAMERON MCGOWAN CURRIE
                                                UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
December 7, 2009

---

[11] The only evidence regarding such communications is testimony by a Liberty Mutual representative that they would call if the customer's answers were internally inconsistent or incomplete. Dkt. No. 28-1 at 17-18 (Meitler Dep. at 39-40); Dkt. No. 30-3 at 10 (Meitler Dep. at 43).

[12] As explained above, Liberty Mutual Fire Insurance Company is the sole remaining Defendant, this being the proper name of the Defendant previously identified as Liberty Mutual Insurance Company. Defendant Liberty Mutual Insurance Group/Boston is dismissed without prejudice by consent. *See supra* n. 1.